**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MICHAEL WALKER,<br><br>Plaintiff<br><br>v.<br><br>PHYSICAN ASSISTANT FAWN LYNN BALDAUF,<br><br>Defendant | : | Civil No. 3:22-cv-713<br><br>(Judge Mariani) |

**MEMORANDUM**

Plaintiff Michael Walker ("Walker"), an inmate housed, at all relevant times, at the State Correctional Institution, Huntingdon, Pennsylvania ("SCI-Huntingdon"), commenced this civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 1). The matter is proceeding via an amended complaint against Certified Registered Nurse Practitioner ("CRNP") Fawn Baldauf. (Doc. 30).

Presently before the Court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 106). The motion is ripe for resolution. For the reasons set forth below, the Court will grant the motion.

## I. Statement of Undisputed Facts[1]

On June 10, 2020, Dr. Malhi treated Walker for complaints of intermittent headaches for the prior two weeks. (Doc. 107 ¶ 2; Doc. 124 ¶ 2). Walker also complained about a small area of a skin breakdown on his back which drains, gets better, and then comes back. (*Id.*). Dr. Malhi planned to treat Walker's headaches with simple analgesics and to order updated lab work. (*Id.*).

On June 18, 2020, Defendant Baldauf saw Walker, at which time he reported having a headache, chills, and a lesion on his back. (*Id.* ¶ 3). Walker denied any other complaints. (*Id.*). Upon examination, Defendant Baldauf observed a moderately sized draining lesion in the lower middle back. (*Id.*). The plan was for Walker to appear at the Physician Assistant Line ("PA Line") for lesion removal. (*Id.*). Walker contends that any medical information that does not pertain to his lesion removal is irrelevant. (Doc. 124 ¶ 3).

On June 22, 2020, Walker submitted Grievance Number 873935, wherein he complained that he was not being protected against COVID-19 with appropriate protocols and that medical care was inadequate. (Doc. 107 ¶ 4). He complained that on June 9, 2020, he had a headache and chill and was seen by Nurse Kinkaid and prescribed Tylenol.

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. *Id.* Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (Docs. 107, 124).

(*Id.*). It was noted that on June 10, 2020, Dr. Malhi treated Walker and provided Tylenol and requested lab work, but Dr Malhi did not order COVID-19 testing. (*Id.*). It was also noted that on June 18, 2020, Defendant Baldauf treated Walker for complaints of a headache and a lesion on his back. (*Id.*). Walker pursued the grievance through all levels of appeal, and it was ultimately dismissed by the Secretary's Office of Inmate Grievances and Appeals ("SOIGA") on September 17, 2020. (*Id.*). SOIGA dismissed the appeal because Walker failed to provide a legible copy of his initial grievance. (Doc. 106-3, at 10). Walker contends that this information is "irrelevant and misleading." (Doc. 124 ¶ 4).

On July 8, 2020, Defendant Baldauf saw Walker at the PA line for removal of a lesion/cyst on his lower back. (Doc. 107 ¶ 5; Doc. 124 ¶ 5). Defendant Baldauf noted that Walker consented to the procedure and tolerated the procedure well. (*Id.*). The area was cleaned and anesthetized before a resection was taken of the area. (*Id.*). It was then closed with three sutures and Walker was instructed to watch for signs and symptoms of increased infection and to follow up as needed. (*Id.*).

On July 9, 2020, Defendant Baldauf noted that Walker was to return to the PA Line in two weeks for suture removal. (Doc. 107 ¶ 6). Walker contends that he "was not scheduled and/or appeared to the PA Line in two weeks." (Doc. 124 ¶ 6) (sic).

On July 13, 2020, Dr. Malhi noted that Walker was seen in medical the previous day. (Doc. 107 ¶ 7). Dr. Malhi noted that Walker had high blood pressure, he was given Lisinopril 5mg, and his blood pressure returned to normal. (*Id.*). Walker also had signs of

edema to his feet. (*Id.*). Dr. Malhi then ordered Lisinopril 5mg and Hydrochlorothiazide ("HCTZ", a diuretic medication) 12.5mg daily and noted that Walker's recent blood test was normal. (*Id.*). Walker contends that this medical information is "'irrelevan[t] and misleading' to the matter and/or issue at hand." (Doc. 124 ¶ 7).

On July 13, 2020 Walker submitted Grievance Number 877565, wherein he complained about the prison's poor conditions and inadequate medical care. (Doc. 107 ¶ 8). He complained that on July 8, 2020, he was called to medical and then examined by Dr. Malhi. Although he described symptoms of COVID-19 to Dr. Malhi, he was not treated for it. (*Id.*). Walker further complained that the conditions of the facility caused him to contract COVID-19, and he did not receive treatment. (*Id.*). Walker pursued the grievance through all levels of appeal, and it was ultimately denied by SOIGA on October 22, 2020. (*Id.*). Walker contends that this medical information is "'irrelevan[t] and misleading' to the matter and/or issue at hand." (Doc. 124 ¶ 8).

On July 17, 2020, Defendant Baldauf saw Walker for his complaints of continued diarrhea and his request for medication. (Doc. 107 ¶ 9). Defendant Baldauf placed an order for Imodium. (*Id.*). Walker contends that this medical information is "'irrelevan[t] and misleading' to the matter and/or issue at hand." (Doc. 124 ¶ 9).

On July 20, 2020, Defendant Baldauf saw Walker at sick call, at which time he reported having headaches for two and a half months, along with chills, shortness of breath, and memory loss. (Doc. 107 ¶ 10). Walker refused to test for COVID- 19 because he did

not want to quarantine. (*Id.*). Walker contends that this medical information is "'irrelevan[t] and misleading' to the matter and/or issue at hand." (Doc. 124 ¶ 10).

Physician Assistant ("PA") Gabrielle Nalley saw Walker on July 22, 2020, for his complaints of diarrhea, which he reported was ongoing for 10 days. (Doc. 107 ¶ 11). Walker also complained of left lower quadrant abdominal pain, and he reported trying Imodium without relief. (*Id.*). Following an exam, PA Nalley's assessment was diverticulitis. (*Id.*). PA Nalley ordered Flagyl and Ciproflxacin, she ordered an X-ray of Walker's abdomen and instructed him to follow up as needed. (*Id.*). Walker contends that this medical information is "'irrelevan[t] and misleading' to the matter and/or issue at hand." (Doc. 124 ¶ 11).

On July 27, 2020, Defendant Baldauf saw Walker at sick call, at which time he reported that he continued to have shortness of breath, and he reported that pus was coming out of the incision site where had had his mole removed. (Doc. 107 ¶ 12; Doc. 124 ¶ 12). Walker made no other complaints at that time. (*Id.*). Defendant Baldauf ordered Bactrim and a chest X-ray and instructed Walker to follow up as needed. (*Id.*).

Dr. Malhi saw Walker on July 28, 2020, at which time he reported having pressure in his head that was better than before, and he denied feeling dizzy, lightheaded, or having chest discomfort. (Doc. 107 ¶ 13). Dr. Malhi's assessment included hypertension and weight gain. (*Id.*). He instructed Walker to decrease his salt intake, exercise, and lose weight. (*Id.*). Dr. Malhi also increased Lisinopril to 10mg/day. (*Id.*).

On July 30, 2020, Walker submitted Grievance Number 880756, wherein he complained that Defendant Baldauf fabricated notes and/or information in his medical records. (*Id.* ¶ 14). On August 6, 2020, the grievance was denied on initial review. (*Id.*). Walker appealed to the Facility Manager, who upheld the initial review response. (*Id.*). Walker did not appeal to SOIGA. (*Id.*).

On August 6, 2020, Walker filed Grievance Number 882072, wherein he complained that corrections officers violated his right of access-to-the-courts by making him sign cash slips for his legal mail. (*Id.* ¶ 15). Walker pursued the grievance through all levels of appeal, and it was ultimately dismissed by SOIGA on December 14, 2020. (*Id.*). SOIGA dismissed the appeal because Walker failed to provide a legible copy of his initial grievance. (Doc. 106-3, at 33).

On August 18, 2020, CRNP Vargas saw Walker for his complaints of persistent shortness of breath, diarrhea, and headaches, that were symptoms of COVID-19. (Doc. 107 ¶ 16). CRNP Vargas renewed Imodium and prescribed Xonopex (an inhaler). (*Id.*).

CRNP Vargas saw Walker on August 19, 2020, while he was in quarantine for suspected COVID-19. (*Id.* ¶ 17). Walker complained of a headache and shortness of breath. (*Id.*). CRNP Vargas prescribed Xoponex. (*Id.*).

On August 21, 2020, Dr. Malhi saw Walker when he was in the Restricted Housing Unit ("RHU") and noted that Walker had signs and symptoms of COVID-19. (*Id.* ¶ 18). Walker was tested for COVID-19 and placed in isolation. (*Id.*). Walker complained of

headaches, diarrhea, and shortness of breath. (*Id.*). Dr. Malhi saw Walker while he was in the restricted housing unit. (*Id.*). Dr. Malhi advised that his test results were pending and encouraged him to drink plenty of fluids. (*Id.*).

On August 24, 2020, Defendant Baldauf renewed Walker's medications. (*Id.* ¶ 19).

On August 25, 2020, Defendant Baldauf saw Walker, at which time he complained of sinus congestion for the previous five days. (*Id.* ¶ 20). He denied any other complaints at that time. (*Id.*). Defendant Baldauf ordered a Z-pack and instructed Walker to follow up as needed. (*Id.*).

On September 2, 2020, Defendant Baldauf noted that she saw Walker while doing rounds. (*Id.* ¶ 21). He was in quarantine for COVID-19 and did not voice any complaints at that time. (*Id.*). Defendant advised Walker to follow up as needed. (*Id.*).

On September 4, 2020, PA Nalley saw Walker for his complaints of frequent sneezing, a dry cough, occasional shortness of breath (that was relieved by his inhaler). (*Id.* ¶ 22). Walker denied any other complaints at that time. (*Id.*). PA Nalley prescribed Claritin and planned to follow up with him as needed. (*Id.*).

On September 10, 2020, Defendant Baldauf saw Walker for his complaints of headaches since being released from quarantine and suffering from a cough for two weeks. (*Id.* ¶ 23). On examination, Walker's neuro signs were intact. (*Id.*). Defendant Baldauf ordered Ibuprofen and Robitussin. (*Id.*).

PA Nalley saw Walker on September 14, 2020, and he complained that his left leg had been swollen for two days. (*Id.* ¶ 24). He denied any other complaints at that time. (*Id.*). PA Nalley planned to increase his blood pressure medications and instructed him to elevate his legs and to follow up as needed. (*Id.*).

Walker contends that the above information set forth in paragraphs 13 through 24 of Defendant's statement of facts is "'irrelevan[t] and misleading' to the matter and/or issue at hand." (Doc. 124 ¶¶ 13-24).

On September 24, 2020, PA Riley saw Walker, at which point it was noted that he had a long history of a lump to his midback, and presented with continued drainage and pain. (Doc. 107 ¶ 25; Doc. 124 ¶ 25). PA Riley noted that Walker had been at sick call for the issue several times in the past. (*Id.*). Walker also complained about having several weeks of shortness of breath along with a cough. (*Id.*). On examination of his back, a 4-7mm raised area of skin to the midline spine at T12-L2 was observed along with inflammation and purulent discharge when pressure applied. (*Id.*). PA Riley's assessment included cellulitis/abscess. (*Id.*). PA Riley planned to obtain a culture of the wound and to treat it with Bactrim DS for 10 days. (*Id.*). Walker was then to follow up at the PA Line to consider if incision and drainage ("I&D") was needed, as well as a possible ultrasound to check the size and position as it lies in the midline spine. (*Id.*). PA Riley advised Walker to follow up in two weeks or earlier. (*Id.*).

On October 6, 2020, Walker filed Grievance Number 892486, complaining that Defendant Baldauf committed medical malpractice during the surgical procedure she performed on him. (*Id.* ¶ 26). He complained that on September 24, 2020, he saw PA Riley for his pain, swelling, discomfort, and discharge from a lesion on his neck close to his spine. (*Id.*). He complained that Defendant Baldauf permitted the lesion to become infected. (*Id.*). Walker pursued the grievance through all levels of appeal, and it was ultimately dismissed by SOIGA on December 10, 2020. (*Id.*). SOIGA dismissed the appeal because Walker failed to provide a legible copy of his initial grievance and because his written appeal to final review exceeded the two-page limit. (Doc. 106-3, at 44). Walker "denie[s]…[that he] failed to follow procedure in pursing [his] appeal." (Doc. 124 ¶ 26).

On October 19, 2020, Dr. Malhi saw Walker, at which time he complained of general body pain, sore throat, and some drainage to his midback. (Doc. 107 ¶ 27; Doc. 124 ¶ 27). On examination of his back, a small cystic lesion about .5 inches was observed, draining bloody discharge. (*Id.*). The area was cleaned and dressed with a bandage. (*Id.*). Dr. Malhi then placed orders for updated blood tests and placed orders for medication as appropriate. (*Id.*).

On October 27, 2020, Dr. Malhi saw Walker for his complaints of an ongoing cough, and Walker requested cough medication. (*Id.* ¶ 28). Dr. Malhi noted that Walker recently had an episode of bronchitis which was treated with antibiotics. (*Id.*). He also complained that his asthma had worsened due to bronchitis, he suffered from headaches and dizziness,

and he reported having generalized aches to his lumbar spine and right hip. (*Id.*). Following an exam, Dr. Malhi's assessment included hypertension (poorly controlled), bronchial asthma, recent bronchitis with ongoing cough, osteoarthritis, overweight, and hypertriglyceridemia. (*Id.*). The plan was to stop HCTZ, increase the dose of Lisinopril, and to start Prinzide for better compliance. (*Id.*). Dr. Malhi also planned to renew Robitussin and to obtain X-rays of Walker's right hip and lumbar spine. (*Id.*).

On October 30, 2020, PA Nalley performed a biopsy of the lesion on Walker's midback and noted that the lesion was "actively draining blood and purulent fluid." (*Id.* ¶ 29; Doc. 124-3, at 23-28). The area was excised, closed with three sutures, and covered with steri-strips. (*Id.*). PA Nalley noted that the specimen was to be sent to the lab for analysis. (*Id.*).

On November 10, 2020, PA Nalley saw Walker to remove his sutures. (Doc. 107 ¶ 30; Doc. 124 ¶ 30). She observed four simple sutures to the excision site of his midback, and a small opening noted to the center of the site, although there was no active drainage. (*Id.*). After Walker gave his consent, PA Nalley injected lidocaine around the wound and removed the sutures. (*Id.*). She then placed one suture to the area of the site that remained open and covered the site with steri-strips. (*Id.*). PA Nalley advised Walker to return to the PA Line in seven to 10 days for suture removal. (*Id.*).

PA Nalley saw Walker on November 13, 2020, for his complaints of an intermittent cough since August and suffering from diarrhea for the previous two days. (Doc. 107 ¶ 31).

Walker denied blood in stools, abdominal pain, fever, and chills, and denied any other complaints at that time. (*Id.* ¶ 31). PA Nalley renewed Robitussin, ordered Imodium and probiotics and advised Walker to follow up as needed. (*Id.*). Walker contends that this medical information is "'irrelevan[t] and misleading' to the matter and/or issue at hand." (Doc. 124 ¶ 31).

On November 20, 2020, Dr. Malhi saw Walker regarding his complaints of feeling weak and tired with headaches. (Doc. 107 ¶ 32; Doc. 124 ¶ 32). Walker also reported weight gain although he was only eating one meal a day. (*Id.*). Dr. Malhi noted that a complete lab evaluation was recently conducted which revealed all tests to be within normal ranges. (*Id.*). Dr. Malhi also noted that Walker recently had a cystic lesion removed from the lumbar area of his back by excision and the resulting pathology report was benign. (*Id.*). It was also noted that one stitch remained, which Dr. Malhi removed and cleaned with betadine. (*Id.*). On examination of Walker's back, the site of the excision was observed and there was no bleeding or discharge, the site was almost healed, and only a small area needed to close. (*Id.*). Dr. Malhi also reviewed an X-ray of Walker's lumbar spine which revealed multi-level disc space narrowing with anterior end plate spurring with bridging osteophytes, and posterior facet hypertrophic changes in the lower lumbar region. (*Id.*). Dr. Malhi's assessment included hypertension (uncontrolled) and a benign lesion to the back. (*Id.*). He added Amlodipine 10mg/daily for blood pressure control. (*Id.*). Walker objects to

any medical records that are "'irrelevan[t] and misleading' to the matter and/or issue at hand." (Doc. 124 ¶ 32).

Defendant Baldauf also saw Walker on November 20, 2020, to address his complaints that since he started taking a probiotic, his diarrhea had increased. (Doc. 107 ¶ 33). Walker also reported a cough for which he requested a renewal of cough syrup. (*Id.*). Defendant Baldauf discontinued the probiotic and renewed cough syrup. (*Id.*). Walker objects to this medical information as "'irrelevan[t] and misleading' to the matter and/or issue at hand." (Doc. 124 ¶ 33).

PA Nalley saw Walker on December 1, 2020, for his complaints of persistent diarrhea since he had COVID-19 and a dry cough since April. (Doc. 107 ¶ 34). He denied any abdominal pain, nausea, or vomiting, and any other complaints at that time. (*Id.*). PA Nalley planned to obtain stool cultures, to order Prilosec, and she advised Walker to follow up as needed. (*Id.*). Walker objects to this medical information as "'irrelevan[t] and misleading' to the matter and/or issue at hand." (Doc. 124 ¶ 34).

On December 30, 2020, Walker saw CRNP Marie Sedlak Lupone at sick call for his complaint of diarrhea which had been ongoing since he had COVID-19. (Doc. 107 ¶ 35). She planned to start Walker on a trial of steroids for potential colitis, she advised Walker to avoid sodium and to continue taking his blood pressure medications. (*Id.*). Walker objects to this medical information as "'irrelevan[t] and misleading' to the matter and/or issue at hand." (Doc. 124 ¶ 35).

CRNP Sedlak Lupone saw Walker at sick call on January 4, 2021, for his complaints of tiredness and general malaise. (Doc. 107 ¶ 36). Following an exam, CRNP Sedlak Lupone suspected that Walker's complaint was multi-factor, i.e. age/inactivity/hypertension/post-covid. (*Id.*). CRNP Sedlak Lupone instructed Walker to exercise, and she planned to review his lab and blood work, and to have Walker's blood pressure reviewed on a monthly basis. (*Id.*). Walker objects to this medical information as "'irrelevan[t] and misleading' to the matter and/or issue at hand." (Doc. 124 ¶ 36).

On January 8, 2021, CRNP Sedlak Lupone saw Walker for his complaint of diarrhea. (Doc. 107 ¶ 37). She placed an order for Acidophilus (a probiotic) and planned to obtain new blood work. (*Id.*). Walker objects to this medical information as "'irrelevan[t] and misleading' to the matter and/or issue at hand." (Doc. 124 ¶ 37).

Dr. Malhi saw Walker on February 17, 2021, for his complaints of an ongoing headache without chest pain, and shortness of breath. (Doc. 107 ¶ 38). Following an exam, Dr. Malhi's assessment included uncontrolled hypertension. (*Id.*). Dr. Malhi increased Prinzide to twice daily. (*Id.*). Walker objects to this medical information as "'irrelevan[t] and misleading' to the matter and/or issue at hand." (Doc. 124 ¶ 38).

On March 2, 2021, Registered Nurse ("RN") Samuel Mauk saw Walker for reports that his back was seeping. (Doc. 107 ¶ 39; Doc. 124 ¶ 39). RN Mauk noted that a scant amount of exudate was observed leaking from an opening to his mid back. (*Id.*). RN Mauk also noted that PA Nalley evaluated Walker and he was placed him on Doxycycline (an

antibiotic) 100mg, twice daily, for 10 days. (*Id.*). He advised Walker to return to medical if his symptoms worsened. (*Id.*).

On March 17, 2021, CRNP Christina Brown, saw Walker at sick call for his complaints of a cough, shortness of breath, and headache. (Doc. 107 ¶ 40). Walker indicated that these were ongoing symptoms with his asthma. (*Id.*). He reported using an Alvesco inhaler and a prescribed Xoponex inhaler, but it had been taken from him because he was overusing it. (*Id.*). Following an examination, CRNP Brown planned to review the results of a chest X-ray, to prescribe Claritin, and to replace the Xoponex inhaler. (*Id.*). Walker agreed to use the inhaler as prescribed. (*Id.*). Walker objects to this medical information as "'irrelevan[t] and misleading' to the matter and/or issue at hand." (Doc. 124 ¶ 40).

Walker asserts that PA Nalley treated him at sick call on December 2, 2022, for complaints of lower back and hip pain. (Doc. 124 ¶ 41). PA Nalley noted that Walker's previous X-ray showed mild to moderate degenerative changes in the lumbar spine and right hip. (*Id.*).

## II. <u>Legal Standard</u>

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non -moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record...or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## III. Discussion

Defendant seeks summary judgment on the following grounds: (1) Walker failed to establish an Eighth Amendment claim; (2) Walker failed to establish a First Amendment claim; (3) Walker's state law claims fail as a matter of law; and (4) Walker failed to properly exhaust his administrative remedies. (Doc. 113). The Court begins its analysis with the threshold question of whether Walker has exhausted his administrative remedies prior to proceeding to federal court.

A. Administrative Exhaustion[2]

The Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e *et seq.*, requires prisoners to exhaust available administrative remedies before suing prison officials for alleged constitutional violations. *See id.* § 1997e(a); *Ross v. Blake*, 578 U.S. 632, 639, 642 (2016) (explaining that only "available" remedies must be exhausted). The PLRA "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). It has been made clear that the exhaustion requirement is mandatory. *See Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007); *see also Booth v. Churner*, 532 U.S. 731, 741 (2001) (holding that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures"); *Nyhuis v. Reno*, 204 F.3d 65, 67 (3d Cir. 2000) (same). "[I]t is beyond the power of [any] court...to excuse compliance with the exhaustion requirement." *Nyhuis*, 204 F.3d at 73 (quoting *Beeson v. Fishkill Corr. Facility*, 28 F. Supp. 2d 884, 894-95 (S.D.N.Y. 1998)).

To exhaust administrative remedies an inmate must comply with all applicable grievance procedures and rules. *Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004). The

---

[2] Because Defendant raised the issue of exhaustion of administrative remedies, the Court issued an Order notifying the parties that it would consider exhaustion in its role as factfinder in accordance with *Paladino v. Newsome*, 885 F.3d 203 (3d Cir. 2018) and *Small v. Camden Cnty.*, 728 F.3d 265 (3d Cir. 2013), and afforded the parties the opportunity to supplement the record with any additional evidence relevant to exhaustion of administrative remedies. (Doc. 129).

PLRA requires not only technical exhaustion of the administrative remedies, but also substantial compliance with procedural requirements. *Spruill*, 372 F.3d at 227-32; *see also Nyhuis*, 204 F.3d at 77-78. A procedural default by the prisoner, either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim. *Spruill*, 372 F.3d at 227-32; *see also Camp v. Brennan*, 219 F.3d 279 (3d Cir. 2000). A procedural default may be excused, however, if the prisoner can show that the administrative remedies were unavailable to him. *See Rinaldi v. United States*, 904 F.3d 257, 266 (3d Cir. 2018) (stating that "[t]he PLRA requires only 'proper exhaustion,' meaning exhaustion of those administrative remedies that are 'available'" (quoting *Woodford v. Ngo*, 548 U.S. 81, 93 (2006)). "An administrative remedy is unavailable when it "operates as a simple dead end[,]...is so opaque that it becomes, practically speaking, incapable of use, or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (quoting *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019)).

The Department of Corrections employs a three-step grievance process that must be completed to properly exhaust administrative remedies in most cases. *See Booth v. Churner*, 206 F.3d 289, 292 n.2 (3d Cir. 2002); *Commonwealth of Pa., Dep't of Corr., Inmate Grievance Sys.*, Policy No. DC-ADM 804 ("DC-ADM 804"). If informal resolution attempts do not resolve the problem, the first step is to file a written grievance (using form

DC-804, Part 1) with the Facility Grievance Coordinator within 15 working days after "the event upon which the claim is based." DC-ADM 804 § 1(A)(3)-(5). An adverse decision by the Grievance Coordinator may be appealed to the Facility Manager within 15 working days of the initial-review response or rejection. *Id.* § 2(A)(1). Finally, the decision of the Facility Manager may be appealed to "Final Review" with the Secretary's Office of Inmate Grievances and Appeals, and again must be submitted within 15 working days of the date of the Facility Manager's decision. *Id.* § 2(B)(1).

The DOC has specific requirements for grievances submitted by inmates. Those requirements include, among other things, that the grievance "be legible [and] understandable"; "include a statement of the facts relevant to the claim" as well as "the date, approximate time, and location of the event(s) that gave rise to the grievance"; that the prisoner "identify individuals directly involved in the event(s)"; and that the grievance include "the specific relief sought," including "compensation or other legal relief normally available from a court." *Id.* § 1(A)(11).

The record reflects that Walker filed five grievances during the relevant time period—numbers 873935, 877565, 880756, 882072, and 892486. Of those five grievances, only numbers 880756 and 892486 pertain to Defendant Baldauf. They are as follows.

On July 30, 2020, Walker submitted Grievance Number 880756, wherein he complained that Defendant Baldauf fabricated notes and/or information in his medical records. (Doc. 30-1; Doc. 106-4). On August 6, 2020, the grievance was denied on initial

review. (Doc. 106-4, at 4). Walker appealed to the Facility Manager, who upheld the initial review response. (*Id.* at 1-3). Walker did not appeal to SOIGA. (*See* Doc. 106-4).

On October 6, 2020, Walker filed Grievance Number 892486, complaining that Defendant Baldauf committed medical malpractice during the surgical procedure she performed on him. (Doc. 30-4; Doc. 107 ¶ 26; Doc. 106-3, at 45-46). Walker stated, in part, as follows:

> I file this formal complaint against the Institution's medical CRNP Baldauf for her unlawful acts of committing medical malpractice during a previous surgical procedure performed on my person thereby subjecting myself to unnecessary and unreasonable pain and suffering, and therefore such constitutes to level of cruel and unusual punishment and is violative of 8th and 14th Amendments. *See Farmer v. Brennan*, 511 U.S. 825 (1994) and *Estelle v. Gamble*, 429 U.S. 97 (1976) ...

(Doc. 106-3, at 45-46).

The grievance was denied on initial review, and Walker appealed to the Facility Manager. (Doc. 106-3, at 47-49). On appeal, the Facility Manager upheld the initial denial of the grievance. (*Id.* at 50). The Facility Manger found as follows:

> In reviewing your grievance and appeal, I note that your concern with your health care was appropriately addressed by Mr. Lynch. In your appeal, you repeat your claim that you received inadequate and improper medical care. In his response to your initial grievance, Mr. Lynch explains you had a mole removal on 7-9-20 and were seen for an infection on 9-24-20. He notes you have been treated with antibiotics and have had several follow up visits. I asked Ms. Price to review your medical record, and she found that you were seen on 9-24-20 by PA Riley who did a culture of your wound and prescribed Bactrim. The culture revealed no staph infection and that Bactrim was an appropriate medication. On 10-19, Dr. Ma[lh]i cleaned and bandaged your incision and recommended a four week follow up. However, in the meantime, PA Nalley did a biopsy and the specimen was sent to the lab. Once the

> results are returned, they will be reviewed with you. I must agree there has been no malpractice or intent to harm you. You have received the appropriate standard of care. Your requested relief is denied.

(*Id.*).

Walker then filed an appeal to SOIGA. (*Id.* at 51-53). SOIGA dismissed the appeal because Walker "failed to provide a *legible* copy of [his] initial grievance…[and] [his] written appeal to final review exceed[ed] the two-page limit." (*Id.* at 44).

Two conclusions can be drawn from this grievance history.

First, there is no evidence of record that Walker appealed Grievance Number 880756 to the Facility Manager or SOIGA. After the grievance was denied on initial review, the next step Walker should have taken was to file an appeal to the Facility Manager, and then, if unsatisfied with the Facility Manger's response, file a final appeal to SOIGA. Walker failed to appeal the initial response at all. And so, Walker abandoned Grievance Number 880756 by failing to fully exhaust the administrative remedy process.

Second, the evidence reflects that Grievance Number 892486 was not properly exhausted and did not contain any retaliation claims against Defendant Baldauf. On December 10, 2020, SOIGA dismissed the appeal of Grievance Number 892486 on procedural grounds "due to a failure to comply with the provisions of the DC-ADM 804" noting that Walker "[has] not provided [SOIGA] with required and/or legible documentation for review" and "[t]he grievance or appeal exceeded the two page limit." (Doc. 106-3, at 44).

More specifically, SOIGA found that Walker "failed to provide a *legible* copy of [his] initial grievance…[and] [his] written appeal to final review exceed[ed] the two-page limit. (*Id.*).

This grievance history confirms that Walker failed to properly exhaust Grievance Number 892486. DC-ADM 804 makes it clear that an inmate appealing a grievance to final review must provide SOIGA with all required documentation relevant to the appeal and that his failure to do so may result in the dismissal of the appeal. As stated, the DOC's grievance policy consists of three steps. The final step involves an appeal to SOIGA within 15 working days of the Facility Manager's Appeal Response. A proper appeal to final review must include: "(1) a legible copy of the Initial Grievance; (2) a copy of the initial review response/rejection and/or remanded initial review response/rejection; (3) a legible copy of the Inmate Appeal to the Facility Manager; (4) a copy of the Facility Manager/designee's decision and/or remanded Facility Manager/designee's decision; (5) a written appeal to the SOIGA…" DC-ADM 804 § 2(B)(1)(j). "[F]ailure to provide any of the documentation noted above may result in the appeal being dismissed." *Id.* § 2(B)(1)(j)(6). The evidence confirms that Walker failed to comply with these requirements. A prisoner's failure to comply with the procedural and substantive requirements of the DOC's grievance policy, as set forth in DC-ADM 804, results in procedural default, thereby precluding an action in federal court. *See Woodford*, 548 U.S. at 84, 90-91; *Spruill*, 372 F.3d at 227-32.

By failing to give SOIGA the required documentation for his grievance appeal, Walker has not followed the applicable procedures outlined in DC-ADM 804, which "supply

the yardstick for measuring procedural default." *Spruill*, 372 F.3d at 231. An inmate's failure to submit the required documents to SOIGA results in the inmate failing to exhaust administrative remedies. *See, e.g.*, *Mack v. Klopotoski*, 540 F. App'x 108, 113 (3d Cir. 2013) (affirming dismissal for inmate's failure to properly exhaust because inmate had failed to include photocopies of his appeals to the Facility Manager and rejecting substantial compliance argument that inmate filed handwritten copies since DC-ADM 804 specifically required photocopies).

As Defendant has provided evidence to support her failure to exhaust defense, the burden shifts to Walker to produce evidence that the DOC administrative remedy process was not available to him.[3]

First, there is simply no evidence of record that Walker properly exhausted his retaliation claim against Defendant Baldauf. As set forth above, a grievance must "include a statement of the facts relevant to the claim." DC-ADM 804 § 1(A)(11). In Grievance Number 892486, Walker does not set forth any purported retaliatory acts by Defendant Baldauf. (Doc. 30-4; Doc. 106-3, at 45-46). Because Walker failed to exhaust his retaliation claim against Defendant, she is entitled to an entry of summary judgment on the retaliation claim. Even had Walker properly exhausted his retaliation claim, Defendant is also entitled

---

[3] Walker does not set forth any argument that he properly exhausted Grievance Number 880756 (see Docs. 123, 128), therefore the Court limits its analysis to Grievance Number 892486.

to summary judgment on the merits of the retaliation claim, as set forth in the following section.

Second, the Court will address whether the administrative remedy process was unavailable to Walker regarding the inadequate medical care claim contained in Grievance Number 892486.

Walker attempts to excuse his procedural default of Grievance Number 892486. He asserts that he exhausted Grievance Number 892486 by sending two letters to the Chief Grievance Officer requesting to resubmit his final appeal, and that he never received a response from SOIGA. (Doc. 123, at 49-50; Doc. 124-3, at 61-62). Walker thus argues that his attempt to fully exhaust Grievance Number 892486 was thwarted by SOIGA's failure to respond to his letters. (Doc. 123, at 50).

The Court finds that there is a genuine dispute as to whether Walker properly exhausted the inadequate medical care claim in Grievance Number 892486. If Walker submitted two letters in an attempt to resubmit his final appeal of Grievance Number 892486 to SOIGA and SOIGA did not respond within the time prescribed, any further administrative remedies under DC-ADM 804 were unavailable to Walker. *See Robinson v. Superintendent*, 831 F.3d 148, 154 (3d Cir. 2016) (holding that administrative remedies were unavailable to a prisoner when the prison failed to timely respond to the prisoner's grievance and then ignored his follow-up requests for a decision on his claim). *See also Shifflett*, 934 F.3d at 365 (holding "that as soon as a prison fails to respond to a properly

submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement"). Therefore, summary judgment is not warranted in favor of Defendant based on failure to exhaust the inadequate medical care claim in Grievance Number 892486.

B. Eighth Amendment Claim

In the context of prison medical care, the Eighth Amendment "requires prison officials to provide basic medical treatment" to incarcerated individuals. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). To state an Eighth Amendment deliberate indifference claim regarding inadequate medical care, a plaintiff must plausibly allege that "(1) he had a serious medical need, (2) the defendants were deliberately indifferent to that need; and (3) the deliberate indifference caused harm to the plaintiff." *Durham v. Kelley*, 82 F.4th 217, 229 (3d Cir. 2023) (citation omitted); *see also Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).

Deliberate indifference by prison officials may be evidenced by intentional refusal to provide care known to be medically necessary, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, and denial of reasonable

requests for treatment resulting in unnecessary suffering or risk of injury. *See Durmer v. O'Carroll*, 991 F.2d 64, 68 & n. 11 (3d Cir. 1993) (quoting *Lanzaro*, 834 F.2d at 346). Deliberate indifference to serious medical needs is an exacting standard, requiring a showing of "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted). Claims sounding in mere medical negligence will not suffice. *Rouse*, 182 F.3d at 197. Disagreement as to proper care also does not support a finding of deliberate indifference. *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990).

Defendant contends that Walker's cyst is not a serious medical condition. (Doc. 113, at 9-10). The Court will assume for the purposes of this Memorandum, however, that Walker's condition is serious.

The record does not establish that Defendant exhibited deliberate indifference to Walker's serious medical need. The record demonstrates that Defendant Baldauf and other medical personnel regularly evaluated and treated Walker for his cyst and other conditions.

The record reflects that Defendant Baldauf treated Walker on the following dates.

On June 18, 2020, Defendant Baldauf saw Walker for his complaints of a headache, chills, and a lesion on his back. (Doc. 107 ¶ 3; Doc. 106-2, at 112-13). Defendant Baldauf examined Walker and advised him to attend the PA Line for removal of the lesion. (*Id.*).

On July 8, 2020, Defendant Baldauf saw Walker at the PA line for removal of a lesion/cyst on his lower back. (Doc. 107 ¶ 5; Doc. 106-2, at 108-09). After receiving Walker's consent, Defendant Baldauf cleaned and anesthetized the area, removed the

lesion, and closed the area with three sutures. (*Id.*). Defendant Baldauf noted that Walker tolerated the procedure well. (*Id.*). She instructed Walker to watch for signs and symptoms of increased infection and to follow up as needed. (*Id.*). On July 9, 2020, Defendant Baldauf noted that Walker was to return to the PA Line in two weeks for suture removal. (Doc. 107 ¶ 6; Doc. 106-2, at 106-07).

On July 17, 2020, Defendant Baldauf saw Walker for his complaints of continued diarrhea and his request for medication. (Doc. 107 ¶ 9; Doc. 106-2, at 101-02). Defendant Baldauf placed an order for Imodium. (*Id.*).

On July 20, 2020, Defendant Baldauf saw Walker at sick call, for his complaints of having headaches for two and a half months, along with chills, shortness of breath, and memory loss. (Doc. 107 ¶ 10; Doc. 106-2, at 94-95). Walker refused to test for COVID-19 because he did not want to quarantine. (*Id.*). Defendant Baldauf noted that Walker was in no acute distress, and she did not observe a cough or shortness of breath. (Doc. 106-2, at 94). She advised Walker to follow up as needed. (*Id.*).

On July 27, 2020, Defendant Baldauf saw Walker at sick call, at which time he reported that he continued to have shortness of breath, and he reported that pus was coming out of the incision site where had had his mole removed. (Doc. 107 ¶ 12; Doc. 106-2, at 87-88). Walker made no other complaints at that time. (*Id.*). Defendant Baldauf ordered Bactrim and a chest X-ray and instructed Walker to follow up as needed. (*Id.*).

On August 24, 2020, Defendant Baldauf renewed Walker's medications. (Doc. 107 ¶ 19; Doc. 106-2, at 74-75).

On August 25, 2020, Defendant Baldauf saw Walker for his complaints of sinus congestion for the previous five days. (Doc. 107 ¶ 20; Doc. 106-2, at 72-73). He denied any other complaints at that time. (*Id.*). Defendant Baldauf ordered a Z-pack and instructed Walker to follow up as needed. (*Id.*).

On September 2, 2020, Defendant Baldauf noted that she saw Walker while doing rounds. (Doc. 107 ¶ 21; Doc. 106-2, at 70-71). Walker was in quarantine for COVID-19 and did not voice any complaints at that time. (*Id.*). Defendant Baldauf advised Walker to follow up as needed. (*Id.*).

On September 10, 2020, Defendant Baldauf saw Walker for his complaints of headaches since being released from quarantine and suffering from a cough for two weeks. (Doc. 107 ¶ 23; Doc. 106-2, at 66-67). On examination, Defendant Baldauf noted that Walker was in no acute distress, and his neuro signs were intact. (*Id.*). Defendant Baldauf ordered Ibuprofen and Robitussin, and advised Walker to follow up as needed. (*Id.*).

On November 20, 2020, Defendant Baldauf saw Walker regarding his complaints that since he started taking a probiotic, his diarrhea had increased, and that he was suffering from a cough. (Doc. 107 ¶ 33; Doc. 106-2, at 27-28). Defendant Baldauf discontinued the probiotic and renewed cough syrup. (*Id.*).

The record shows that Defendant Baldauf did not treat Walker on any other occasions during the relevant time period.

The number, variety, and consistency of medical examinations, tests, and other diagnostic procedures performed on Walker while he was housed at SCI-Huntingdon preclude a finding that Defendant was deliberately indifferent to his medical needs. *See e.g.*, *Gause v. Diguglielmo*, 339 F. App'x 132, 135 (3d Cir. 2009) (finding no deliberate indifference where "[plaintiff's] medical records show that he was seen many times by the prison medical staff and received medicine, physical therapy, and even treatment outside of the prison," thus establishing that "[plaintiff] received medical care."). The record includes voluminous medical records that demonstrate that Walker received regular treatment and follow up care for his cyst and other complaints, including diagnostic tests such X-rays, excision of the cyst, and medication and inhalers, throughout the period relevant to this action. As demonstrated by the record, most assessments and treatments were in response to Walker's sick call requests, and the remainder were for follow-up assessments or treatments. Courts have consistently concluded that assessment, treatment, and care such as provided in this case negates a finding of deliberate indifference under the Eighth Amendment. *See Trainer v. Wellpath*, 2023 WL 2603196, at *19 (W.D. Pa. Mar. 22, 2023) (collecting cases).

Furthermore, insofar as Walker objects to the treatment he received, prisoners "do not have a constitutional right to choose their own medical providers nor to obtain treatment

of their own choosing." *Abdulrazzaq v. Trump*, 422 F. Supp. 3d 281, 291 (D.D.C. 2019) (citing *Roberts v. Spalding*, 783 F.2d 867, 870 (9th Cir. 1986) ("A prison inmate has no independent constitutional right to outside medical care additional and supplemental to the medical care provided by the prison staff within the institution."); *United States v. Rovetuso*, 768 F.2d 809, 825 (7th Cir. 1985) ("The Eighth Amendment guarantees a prisoner treatment of his serious medical needs, not a doctor of his own choosing."). Any perceived disagreement with Defendant Baldauf as to the proper course of diagnosis and treatment is insufficient to state an Eighth Amendment claim. *See McCluskey v. Vincent*, 505 F. App'x 199, 203 (3d Cir. 2012) (determining that the prisoner's complaints that his doctor should have ordered a biopsy was "a classic example of a matter for medical judgment, and does not represent cruel and unusual punishment" (internal quotations omitted)); *Hodge v. United States DOJ*, 372 F. App'x 264, 268 (3d Cir. 2010) (holding that disagreements between the prisoner and his physicians, or among physicians, concerning the course of medical treatment do not support a claim for a violation of the Eighth Amendment).

To the extent that Walker contends that his medical care was delayed from July 2020, when Defendant removed the lesion, to September 2020, when he saw providers again for this issue (*see* Doc. 123, at 3-4), nothing in the record indicates that Defendant delayed or impeded Walker's medical care. Defendant's treatment of Walker does not amount to deliberate indifference. *See, e.g.*, *Pearson v. Prison Health Service*, 850 F.3d 526, 538 (3d Cir. 2017) (finding no Eighth Amendment violation where a nurse inadequately

diagnosed and treated a prisoner's appendicitis as a pulled muscle); *Stewart v. Pa. Dep't of Corr.*, 677 F. App'x 816, 820 (3d Cir. 2017) (citing *Kost v. Kozakiewicz*, 1 F.3d 176, 185 (3d Cir. 1993)) (the misdiagnosis of a fracture resulting in delayed treatment at worst amounted to medical malpractice, which is not actionable under the Eighth Amendment).

While Walker appears to be frustrated by the medical care he received, there is nothing to suggest that Defendant Baldauf was deliberately indifferent to his medical needs. Deliberate indifference is a stringent standard. The record does not support any such conduct by Defendant Baldauf.

C. First Amendment Claim

To state a retaliation claim under the First Amendment, a plaintiff bears the burden of satisfying three elements. First, a plaintiff must prove that he was engaged in constitutionally protected activity. *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). Second, a plaintiff must demonstrate that he "suffered some 'adverse action' at the hands of prison officials." *Id.* (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)). This requirement is satisfied by showing adverse action "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights." *Id.* (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)). Third, a prisoner must prove that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him." *Rauser*, 241 F.3d at 333-34 (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The mere fact that an adverse action occurs after either a complaint or grievance is filed is relevant, but not dispositive, for the purpose of establishing a causal link between the two events. *See Lape v. Pennsylvania*, 157 F. App'x 491, 498 (3d Cir. 2005). Only when the facts of a particular case are "unusually suggestive" of a retaliatory motive will temporal proximity, on its own, support an inference of causation. *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997). The Third Circuit has noted that an inmate can satisfy this burden "with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2002).

If a prisoner establishes a *prima facie* case of retaliation, the burden shifts to prison officials to show, by a preponderance of the evidence, that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334. "This is often referred to as the 'same decision defense." *Watson*, 834 F.3d at 422. If the prison officials can make this showing, it defeats the retaliation claim. *See Carter v. McGrady*, 292 F.3d 152, 159 (3d Cir. 2002).

Walker asserts that Defendant Baldauf withheld or delayed treatment, in retaliation of grievances that Walker filed. (Doc. 30 ¶¶ 4, 80).

With respect to the first *Rauser* prong, the filing of an inmate grievance constitutes a constitutionally protected activity. *See Fantone v. Latini*, 780 F.3d 184, 192 n.8 (3d Cir. 2015) ("The filing of a prison grievance is an activity protected by the First Amendment.").

Regarding the second *Rauser* prong, Walker failed to produce evidence that he suffered adverse action at the hands of Defendant Baldauf. The Court will not repeat the relevant facts as they relate to Walker's inadequate medical care claim. As set forth above, the Court finds that record does not support a deliberate indifference claim against Defendant Baldauf. It thus follows that, with respect to the retaliation claim, Walker has failed to establish that he suffered any adverse action.

The third *Rauser* prong requires a prisoner to prove that his constitutionally protected conduct was a substantial or motivating factor in the adverse action. Walker has failed to adduce any evidence that his filing of grievances was a substantial or motivating factor in the medical care he received.

For purposes of determining whether a pattern of antagonism has been shown to exist on the record evidence, that would suggest a causal link, the Court has carefully reviewed all of the instances where Walker identified interactions between himself and Defendant Baldauf for purposes of diagnoses and treatment of various complaints, medical examinations, tests, or other diagnostic procedures. The Court finds no evidence of record that would create a genuine dispute of material fact as to whether any antagonism existed between Walker and Defendant Baldauf, let alone a pattern of antagonism. Accordingly,

Walker cannot avoid a grant of summary judgment in Defendant Baldauf's favor since the paradigm for establishing retaliation has not been established over the entire period of Walker's treatment by Baldauf, as set forth herein.

In sum, the record does not support Walker's retaliation claim, and Defendant is entitled to summary judgment on the First Amendment retaliation claim.

D. State Law Claims

Walker also brings six counts against Defendant premised on Pennsylvania state law. (Doc. 30, Counts IV, VI, VII, VIII, IX, and X). The Court declines to exercise supplemental jurisdiction over these claims.

Under Section 1367(c)(3), the Court "may decline to exercise supplemental jurisdiction" over state law claims if it "has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). The Third Circuit stated that the district court "'*must* decline' to exercise supplemental jurisdiction in such circumstances 'unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'" *Stone v. Martin*, 720 F. App'x 132, 136 (3d Cir. 2017) (quoting *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (emphasis in original)).

Because the Court finds that Defendant is entitled to judgment in her favor on the federal claims, the Court declines to exercise supplement jurisdiction over Walker's state law claims and finds that declining supplemental jurisdiction is not unfair to the parties and does not unduly hinder judicial economy. The Court will dismiss Walker's state law claims

(Counts IV, VI, VII, VIII, IX, and X) without prejudice to his right to reassert them in state court.

## IV. Conclusion

Consistent with the foregoing, the Court will grant Defendant's Rule 56 motion and enter judgment in her favor. (Doc. 106). A separate Order shall issue.

Robert D. Mariani
United States District Judge

Dated: August 7, 2026